| UNITED STATES BANKRUPTCY COURT<br>DISTRICT OF NEW JERSEY | |
|---|---|
| In Re: | Case No.:       23-19257-ABA |
| Stephen David Samost, | Chapter:        11 |
| Debtor. | Hearing Date:   March 14, 2024 |
| | Judge:          Andrew B. Altenburg, Jr. |

## MEMORANDUM DECISION

Before the court is the Motion of Debtor and Debtor-in-Possession for a Determination that the New Jersey Department of Environmental Protection has Violated the Automatic Stay and is Liable for Punitive Damages, Legal Fees, and Costs and supplemental requests, Doc. Nos. 33, 47 and 51, (collectively, the "Motion") filed by Stephen David Samost (the "Debtor"). The New Jersey Department of Environmental Protection (the "NJDEP") opposed the Motion (the "Opposition"), Doc. No. 52, arguing that the police and regulatory power exception to the automatic stay under section 362(b)(4) of the Bankruptcy Code, 11 U.S.C. § 362(b)(4), applies to its post-petition actions. Thus, the issue at hand is whether the police and regulatory power exception to the automatic stay under section 362(b)(4) applies to the NJDEP's post-petition actions here. For the reasons that follow, the court determines that based on the current procedural posture of the state court litigation, including the entry of a money judgment against the Debtor, the police and regulatory power exception to the automatic stay is not applicable and the NJDEP has violated the automatic stay.

## JURISDICTION AND VENUE

This matter before the court is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A),(G) and (O), and the court has jurisdiction pursuant to 28 U.S.C. § 1334, 28 U.S.C. § 157(a) and the Standing Order of Reference issued by the United States District Court for the District of New Jersey on July 23, 1984, as amended on September 18, 2012, referring all bankruptcy cases to the bankruptcy court. The following constitutes this court's findings of fact and conclusions of law as required by Federal Rule of Bankruptcy Procedure 7052.

## PROCEDURAL HISTORY

The Debtor filed for protection under chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"), on October 18, 2023 (the "Petition Date") thereby invoking the protections of the automatic stay, with certain exceptions, provided for under section 362, 11 U.S.C. §362.

1

The Debtor's proposed Subchapter V Plan of Reorganization (the "Plan") was filed on December 13, 2023. (Doc. No. 23). The Plan proposes to pay one hundred (100%) of his obligations over time. *Id.* The NJDEP has filed an objection to confirmation of that Plan. (Doc. No. 39).

On January 17, 2024, the Debtor filed his Motion requesting that the matter be heard on shortened time which the court granted. The basis of the Motion was because on January 11, 2024, the NJDEP filed an Application (as a cross-motion to the motion of a state court appointed receiver to be discharged in a state court action) which sought to modify and/or eliminate the position of the Receiver, modify or eliminate all of the state court orders that called for deposits by the Debtor for construction costs to be made to the Receiver, and sought to impose personal liability for the actual repair of the Centennial Lakes Dam on the Debtor. The NJDEP Application was returnable in state court on January 19, 2024 — the same date as the Receiver's motion.

After a hearing on the matter, the court entered an Order Regarding Motion of Debtor and Debtor-in-Possession for a Determination that the New Jersey Department of Environmental Protection has Violated the Automatic Stay and is Liable for Punitive Damages, Legal Fees and Costs, Doc. No. 38, which stayed the state court matter and required further briefing and scheduled another hearing.

The parties have made their submissions and argued their cases. The court has reviewed the submissions and heard oral arguments of counsel. The record is closed and the matter is ripe for disposition.

## FACTS[1]

The bankruptcy filing was due largely to a result of matters arising from state court litigation, captioned *NJDEP v. Centennial Land and Development Corp., et als.,* Docket No. BUR-C-77-04 (the "Dam Litigation") commenced in 2004. Doc. No. 33-2, ¶ 4. The Dam Litigation concerned the repair of a dam that was built on Centennial Lakes (the "Dam"). *Id.* The Dam was originally owned by Centennial Lakes Development Corp ("CLDC"), but as a result of Federal litigation which occurred in 2001, ownership of CLDC was transferred to Devel LLC, an entity owned by the Debtor and his wife. *Id.* at ¶¶ 5 and 7. In 2010, the state court entered summary judgment in favor of the NJDEP (the "2010 Order"). Doc. No. 52-7 (Exhibit B to the NJDEP's Opposition). In the 2010 Order, the state court simply ruled that the Debtor's defenses had no merit and that he was liable under the *Safe Dam Act,* N.J. Stat. Ann. 58:4-1–8.1 (the "SDA"). Doc. No. 52-7, at 19. No other relief or remedy was determined at that time.

In a decision that followed the 2010 Order which, "found liability under the [SDA][2] among various defendants," Doc. No. 52-8, at 3, the state court, in 2012 held that the Debtor was directly

---

[1] The parties have submitted voluminous materials as exhibits to their pleadings. Much of that material is unwieldy, unrelated, or irrelevant to the issue at hand. Nevertheless, the parties have conceded that the relevant facts for the issue at hand arise out of this court's interpretation of Exhibits B, C, D, K, L, P, Q, R, and T attached to the NJDEP's Opposition, Doc. No. 52.

2

liable for 45% of the costs necessary to fund the necessary studies and to repair the Dam (the "2012 Order"), Doc. No. 52-8, at 36 (Exhibit C to the NJDEP's Opposition). The court also scheduled a conference for the appointment of a Receiver and to:

> create a fund of monies in order to proceed with the DEP requested dam safety inspection report, an emergency action plan, an operational maintenance manual, a final design report and a permit application for repair of the dam. None of the parties liable under the [SDA] have undertaken these activities and thus, the Court intends to proceed through a special master with funding provided according to the allocation in this decision.

Doc. No. 52-8, at 37-38.

Ultimately, Llewellyn Mathews, Esq. was appointed as Receiver (the "Receiver") on June 20, 2012 "to collect money from the responsible parties and to enter into contracts to repair the Dam." Doc. No. 52, ¶13. Under the order appointing him, *the Receiver* was solely responsible for the reconstruction and repair of the Dam and the Debtor was responsible for his share of the costs related thereto. Doc. No. 52-9 (Exhibit D to the NJDEP's Opposition) (the "Receiver Order").

The state court entered subsequent orders in 2012, 2014, and 2017 compelling the responsible parties[2] to deposit monies with the Receiver in order for the Receiver to undertake engineering and repair of the Dam to be completed. The Debtor states that neither he nor his father paid their respective shares. Doc. No. 33-2, ¶ ¶ 8-10. None of the orders entered required the Debtor to personally repair the Dam but rather, simply to fund his share of the costs.

In September 2021, the NJDEP filed an amended cross-motion in Aid of Litigant's Rights seeking relief due to the Debtor's failure to comply with those previous orders. Doc. No. 52-17, ¶ 20. At that time, it sought a court order requiring the Debtor to deposit $1,078,578.45 with the Receiver for the Dam's repair and to pay a $700,000.00 penalty, plus interest, within 30 days. The court partially granted that relief on May 9, 2022 ("May 9 Order"). Doc. No. 52-16 (Exhibit K to the NJDEP's Opposition). In the May 9 Order, the court directed the Debtor to pay to the Receiver 45% of the costs necessary to repair the Dam, to be made within 35 days of the order. The state court further ordered the NJDEP and the Receiver to confer on the amount constituting the repair costs and to provide all parties with notice of that amount. Finally, the court granted the NJDEP's request for the $700,000.00 penalty, plus interest, citing the Debtor's "repeated refusal to comply with court orders and the Receiver's requests." *Id.* Nothing in the May 9 Order or the Statement of Reasons accompanying it suggests that the Debtor was to personally or physically undertake repair of the Dam. Rather the focus was on the Debtor paying his share.[3]

---

[2]    In addition to the Debtor, the responsible parties are the Debtor's now-deceased father, Joseph Samost, the Pines Lake Club, and Burlington County. The state court allocated 45% responsibility to the Debtor, 45% responsibility to Joseph Samost and the remaining liability to the Pines Lake Club and Burlington County.

[3]    Interestingly, the state court acknowledged that part of the Requested Reliefs sought in the motion was the imposition of "more coercive remedies, including but not limited to incarceration" *for non-payment* not physical construction. Doc. 52-16, at 5. It is difficult for this court to understand how incarceration would be an effective remedy if the Debtor was expected to physically complete the Dam.

The Debtor sought reconsideration and was denied. The Debtor continued to vigorously contest the NJDEP's efforts to collect but was unsuccessful.

On August 22, 2022, the NJDEP filed a motion for post-judgment discovery based on the May 9 Order and the Debtor's failure "to comply with the court orders to *deposit* th*e construction funds*." Doc. No. 52-23, at 4 (emphasis added). In its pleadings filed with the state court, the NJDEP specifically admits:

> The Court's May 9, 2022 Order ***constitutes an "order for the payment of money.***" The Order requires [the Debtor] to pay two amounts, 45% of *the construction costs* and the penalty.

Doc. No. 52-25, at 3 (Exhibit T to the NJDEP's Opposition). The NJDEP's submission further goes on to state that the correct amount owed for the construction costs at that time as "$1,078,578.45." *Id*.

The state court granted the NJDEP's motion and entered an order on November 14, 2022 (the "November 14 Order"). Doc. No. 52-23 (Exhibit R to the NJDEP's Opposition). In its Statement of Reasons attached to the November 14 Order, the court ruled:

> The court's May 9, 2022 order requires [the Debtor] to pay 45% of the construction costs and the penalty. The order did not contain an exact dollar amount in part because of a discrepancy between the amounts cited in the NJDEP's and Receiver's submissions to the court. In fact, the amount to be paid was already determined as the percentage amount owed by Defendant based on the joint liability of other tortfeasors. On May 27, 2022, NJDEP notified Defendant of the amount owed: $1,078,578.45. Additionally, [the Debtor] responded to the information subpoena sent by NJDEP in July 2022, clearly understanding that Plaintiff was a valid judgment creditor. The Receiver serves as an officer of the court to oversee the construction for repairing the Dam. He is not a separate party to this action. ***Thus, the order dated May 9, 2022 was a final Order for a sum certain and NJDEP is a valid judgment creditor.***

*Id*. at 6 (emphasis added). In denying the Debtor's cross-motion for a protective order, that court noted that every defendant was potentially responsible for the *cost of repair* for the Dam and as such, the "NJDEP has established its prima facie right to recover damages and seeks the requested discovery ***to satisfy its judgments***." *Id*. at 7 (emphasis added).

Of course, the Debtor did not deposit funds with the Receiver, so on January 13, 2023, the NJDEP issued an administrative order ("2023 Administrative Order") which simply ordered that:

> The Respondents are jointly and severally liable ***for depositing sufficient funds with the Receiver for the Dam's repair***. Nothing herein alters the Respondents' ability to seek reimbursement from any other Respondent for expenditures made for the Dam repair that exceed the Court's allocation of responsibility for the Dam.

4

Doc. No. 52-17, ¶ 27 (Exhibit L to the NJDEP's Opposition) (emphasis added). Again, the focus was on the Debtor's liability for depositing funds and nothing contained therein specifically or clearly directed the Debtor personally or physically repair the Dam. Rather all actual reconstruction obligations remained with the Receiver. *Id*. at ¶¶ 12 and 30.

The Debtor filed for bankruptcy protection on October 18, 2023 giving rise, with certain exceptions, to the protections of the automatic stay provided for under section 362 of the Bankruptcy Code. As noted above, the Debtor's Plan was filed on December 13, 2023. The Plan proposes to pay one hundred (100%) of the Debtor's obligations over time (not to exceed 5 years). The Plan also notes that the Debtor has potential claims against the NJDEP, the Receiver, and others, arising out of actions and/or inaction in the Dam Litigation and related matters.

On January 18, 2024, the NJDEP filed a proof of claim against the Debtor in this case in the amount of $2,808,110.96 representing the amount of penalties it claims it is due under the SDA. *See* Claims Register, Claim 11-1.[4] It has not filed a proof of claim for the costs of construction which it claims now exceeds $3 million. The Receiver and the Pines Lake Club, a co-defendant of the Debtor in the Dam Litigation, have also filed a proofs of claim in this case. *See* Claims Register, Claims 5-1 and 7-1.

In December 2023, the Receiver filed an application in the state court to be discharged due to his impending retirement. The NJDEP then, without seeking relief from the automatic stay in this court, filed a cross-motion (the "NJDEP Application"), seeking to rescind orders and portions of orders related to the Receiver. Doc. No. 52-22 (Exhibit Q to the NJDEP's Opposition). In the NJDEP Application, the NJDEP acknowledged that the state court appointed the Receiver to collect funds from the responsible parties, relevant here, the Debtor, and for the Receiver to repair the Dam. *Id.* at 6. As part of its reasoning, the NJDEP states that "[i]nstead of complying with the [financial information] subpoenas, [the Debtor] filed for Chapter 11 Bankruptcy." *Id.* at 12. The NJDEP then lists reasons suggesting that the Debtor, in utilizing the bankruptcy process, is trying to subvert the orders entered by the state court throughout the Dam Litigation.[5] *Id.* at 12-13. Specifically, the NJDEP asks the state court to rescind (1) the Receiver Order and (2) paragraph two of the May 9 Order, which required the responsible parties to deposit funds with the Receiver. The NJDEP argues that the simple reason for the cross motion is "with the Receiver's discharge in these matters, the responsible parties have no person with whom to deposit the construction money." *Id.* at 16. During oral argument, the NJDEP admitted that a substitute receiver could be appointed — but that relief was not sought. The Debtor argues that the NJDEP seeks to eliminate the position of the Receiver, modify or eliminate all of the state court orders that called for contributions to the Receiver on the money judgment and thereby effectively imposing the liability for actual construction of the Dam on the Debtor. Doc. No. 33, ¶16.

---

[4] The court can take judicial notice of the docket entries in this case. Fed. R. Evid. 201, incorporated in these proceedings by Fed. R. Bankr. P. 9017. *See In re Indian Palms Assocs., Ltd.*, 61 F.3d 197, 204 (3d Cir. 1995); *Maritime Elec. Co., Inc. v. United Jersey Bank,* 959 F.2d 1194, 1200 n. 3 (3d Cir. 1991); *In re Aughenbaugh*, 125 F.2d 887, 889 (3d Cir. 1942).

[5] These arguments might be better argued before this court for other relief it may seek here.

5

Then, on its own through a new Administrative Order in January 2024, the NJDEP withdrew the 2023 Administrative Order, citing the Receiver's application to be discharged (the "2024 Administrative Order"). Doc. No. 52-21 (Exhibit P to the NJDEP's Opposition). In that Order, the NJDEP concluded:

> The responsible parties are reminded that they are still responsible for repairing the Dam themselves under the [2010 Order]. If one or more of the responsible parties do not step forward and agree to repair the Dam, appropriate enforcement action will be taken in the N.J. Superior Court. Nothing waives any responsible party's right to seek contribution for any costs associated with the Dam's repairs in accordance with the Court's [2012 Order], allocation decision.

*Id.* at 3. The NJDEP confirmed that the purpose of the 2024 Administrative Order was to put the responsibility of completing the work for the Dam on, *inter alia*, the Debtor. Doc. No. 52, at 10-11. During oral argument, the NJDEP admitted that through its post-petition actions, it was in fact, "changing the nature of things" by doing so. Audio of March 14, 2024 Hearing, at 2:33 – 2:35.

Finally, of note, the NJDEP has admitted "[t]o date, the [NJDEP] has determined that the Dam does not present an imminent danger of failure." Doc. No. 52, at 4.

The Debtor alleges that the NJDEP Application and 2024 Administrative Order are violations of the automatic stay granted under section 362 of the Bankruptcy Code because the NJDEP Application and the 2024 Administrative Order are post-petition attempts by a judgment creditor to modify the rights and responsibilities of the Debtor by eliminating the receivership in its entirety effectively making the Debtor directly responsible for the reconstruction and further by eliminating the conclusively determined liabilities and monetary obligations of the Debtor as determined by the final judgment and various other orders entered in the Dam Litigation.

The NJDEP states that the Debtor is incorrect in his assertions that it violated the automatic stay as its post-petition actions fall under the police and regulatory power exception to the automatic stay under section 362(b)(4). Doc. No. 52, at 2.

## DISCUSSION

### I. The Police and Regulatory Exception to the Automatic Stay

#### A. The Law

"When a debtor files for bankruptcy, Section 362(a) of the Bankruptcy Code imposes a broad automatic stay." *In re Nortel Networks, Inc.*, 669 F.3d 128, 137 (3d Cir. 2011). It is well understood that the filing of a bankruptcy petition operates as a stay to *all* entities of:

> (1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title;

6

> (2) the enforcement, against the debtor or against property of the estate, of a judgment obtained before the commencement of the case under this title; . . .
>
> \* \* \*
>
> (6) any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title; . . .

11 U.S.C. § 362(a)(1), (2) and (6). Indeed, "[t]he automatic stay provides one of the fundamental protections for debtors found in the Bankruptcy Code." *Nortel Networks,* 669 F.3d at 137 (*citing Midlantic Nat'l Bank v. N.J. Dep't of Envtl. Prot.,* 474 U.S. 494, 503 (1986)). The automatic stay applies to the NJDEP. *Penn Terra Ltd. v. Dep't of Envtl. Res.*, 733 F.2d 267, 271 (3d Cir. 1984).

However, there is an exception to the automatic stay provided by section 362(b)(4) which provides:

> (b) The filing of a petition under section 301, 302, or 303 of this title, or of an application under section 5(a)(3) of the Securities Investor Protection Act of 1970, does not operate as a stay--
>
> (4) under paragraph (1), (2), (3), or (6) of subsection (a) of this section, of the commencement or continuation of an action or proceeding by a governmental unit or any organization exercising authority under the Convention on the Prohibition of the Development, Production, Stockpiling and Use of Chemical Weapons and on Their Destruction, opened for signature on January 13, 1993, to enforce such governmental unit's or organization's police and regulatory power, including the enforcement of a judgment ***other than a money judgment***, obtained in an action or proceeding by the governmental unit to enforce such governmental unit's or organization's police or regulatory power;

11 U.S.C. § 362 (emphasis added). "This exception discourages debtors from submitting bankruptcy petitions either primarily or solely for the purpose of evading impending governmental efforts to invoke the governmental police powers to enjoin or deter ongoing debtor conduct which would seriously threaten the public safety and welfare (*e.g.,* environmental and/or consumer protection regulations)." *Nortel Networks,* 669 F.3d at 137 (other citations omitted).

Of course, a party may not invoke the police and regulatory power exception to the automatic stay by merely stating that it applies. Instead,

> courts have applied two "related, and somewhat overlapping" tests: the pecuniary purpose test and the public policy test.[12] *Lockyer v. Mirant Corp.,* 398 F.3d 1098, 1108 (9th Cir. 2005). The pecuniary purpose test asks whether the government primarily seeks to protect a pecuniary governmental interest in the debtor's property, as opposed to protecting the public safety and health. The public policy test asks whether the government is effectuating public policy rather than adjudicating private rights. If the purpose of the law is to promote public safety and welfare or to effectuate public policy, then the exception to the automatic stay

7

applies. If, on the other hand, the purpose of the law is to protect the government's pecuniary interest in the debtor's property or primarily to adjudicate private rights, then the exception is inapplicable. *See, e.g., Chao,* 270 F.3d at 385. The complementary tests "are designed to sort out cases in which the government is bringing suit in furtherance of *either* its own or certain private parties' interest in obtaining a pecuniary advantage over other creditors." *Id.* at 389.

*Nortel Networks, Inc.*, 669 F.3d at 139–40. The Third Circuit cautioned that there is no blanket rule as to whether a particular proceeding qualifies for the police power exception; rather, courts should "look to the purpose of the proceeding at issue." *Id.* at 140. Still, "under circumstances involving a question of federal-state preemption arising in a case involving environmental hazards, 'the exception to the automatic stay provision contained in subsections 362(b)(4)–(5) should itself be construed broadly, and no unnatural efforts be made to limit its scope.'" *Id.* (quoting *Penn Terra,* 733 F.2d at 273). "'Thus, where a governmental unit is suing a debtor to prevent or stop violation of fraud, environmental protection, consumer protection, safety, or similar police or regulatory laws, or attempting to fix damages for violation of such a law, the action or proceeding is not stayed under the automatic stay.'" *Nortel Networks,* 669 F.3d at 141 (quoting S.Rep. No. 95–989 at 49 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5838).

But, as there is a police power exception to the automatic stay, so too is there an exception to that exception — the "money judgment" exception. This "exception to the exception," in section 362(b)(4) specifically does not permit the enforcement of ***a money judgment*** under the police and regulatory power exception to the automatic stay. *Penn Terra*, 733 F.2d at 272-73, and fn. 5. This is because "[s]ince the assets of the debtor are in the possession and control of the bankruptcy court, and since they constitute a fund out of which all creditors are entitled to share, enforcement by a government unit of a money judgment would give it preferential treatment to the detriment of all other creditors." [6] *Id.* at 272 (citing S.Rep. No. 95–989 at 52, 1978 U.S.Code Cong. & Ad.News at 5787, 5838; H. Rep. No. 95–595 at 343, 1978 U.S.Code Cong. & Ad.News at 6299). Notwithstanding, the money judgment exception to the police power exception "should be construed *narrowly* so as to leave to the States as much of their police power as a fair reading of the statute allows." *Penn Terra*, 733 F.2d at 273.

It is understood that:

the mere *entry* of a money judgment by a governmental unit is not affected by the automatic stay, provided of course that such proceedings are related to that government's police or regulatory powers.

Quite separate from the entry of a money judgment, however, is a proceeding to *enforce* that money judgment. The paradigm for such a proceeding is when, having

---

[6] While the court recognizes that the Third Circuit was specifically speaking to section 362(b)(5) when providing this rationale, "[i]n 1998, Congress amended 11 U.S.C.S. § 362(b)(4) and (b)(5) with very little commentary. The amendment repealed § 362(b)(5) and folded the language into the new § 362(b)(4). Iran Missile Proliferation Sanctions Act of 1997, Pub. L. No. 105-277, Div. I, Title VI, § 603(1), 112 Stat. 2681 (1998). The legislative history surrounding the amendment contains minimal discussion of the purpose for the change. 144 Cong. Rec. H4283 (daily ed. June 9, 1998) and 143 Cong. Rec. H10646 (daily ed. Nov. 12, 1997)." *United States v. Fed. Res. Corp.*, 525 B.R. 759, 761 (D. Idaho 2015). Accordingly, the rationale applies to the discussion of section 362(b)(4) today.

8

> obtained a judgment for a sum certain, a plaintiff attempts to seize property of the defendant in order to satisfy that judgment.

*Id*. at 275 (emphasis in original). Thus, while an action fixing liability in an environmental action is excepted from the stay, an action to enforce those liabilities via collection of money judgment is not excepted from enforcement of the stay. *Brock v. Morysville Body Works, Inc*., 829 F.2d 383, 389 (3d Cir. 1987) (although the stay does not operate against actions or proceedings by governmental units "attempting to fix damages for violation of such a [health and safety] law," it does prevent a governmental unit from enforcing a money judgment.) (internal citations omitted); *In re Lenz Oil Serv., Inc.*, 65 B.R. 292, 295 (Bankr. N.D. Ill. 1986) (if the state prevails in the pending environmental action, and if the state court imposes civil penalties, any attempt by the state to collect those penalties would be an attempt to enforce a money judgment).

### B. The Parties' Arguments

The Debtor asserts the *Penn Terra* test suggests that the NJDEP's claims against him are purely in the nature of enforcement of a money judgment. Doc. No. 33 at 8. The Debtor argues that because the NJDEP obtained a specific monetary allocation against him and sought post-judgment discovery against certain of Debtor's affiliates, which can only be sought as a result of having obtained a money judgment, all of the NJDEP' claims against the Debtor are stayed pursuant to the automatic stay and police power exception is not applicable. *Id*. at 8-9.

The NJDEP counters that the filing of the NJDEP Application and the 2024 Administrative Order were appropriate uses of its police and regulatory power and its actions are not stayed. Doc. 52, at 10-16. The NJDEP argues that the NJDEP Application filed in the state court and its 2024 Administrative Order did not violate the automatic stay because they are not attempts to collect money judgment or protect the NJDEP's pecuniary interest or primarily to adjudicate private rights; nor an attempt to end run around the automatic stay. *Id*. at 16-21. The NJDEP also asserts the NJDEP Application and 2024 Administrative Order relate to the Debtor's obligation to repair the Dam and such obligation is not a claim. *Id*. at 21. The NJDEP maintains that *Ohio v. Kovacs*, 469 U.S. 274, 285 (1985) is distinguishable because the Debtor has maintained control of the Dam. The NJDEP additionally asserts the obligation to repair the Dam is not a claim because the SDA doesn't permit the NJDEP to repair the Dam and then seek reimbursement. Doc. 55, at 22 (citing *Torwico Electronics, Inc. v. State of New Jersey, Dep't of Envtl. Prot. and Energy*, 8 F.3d 146, 151 (3d Cir. 1993) (determining that obligations under orders or statutes like ISRA or RCRA — that require performance rather than payment — are not "claims" subject to discharge and holding that debtor was required to clean up its former site of operations)). Further, the NJDEP argues that *Kovacs* requires when a receiver is discharged whichever party becomes responsible for compliance must comply with state law. Doc 52, at 22 (citing 469 U.S. at 285).

In sum, the NJDEP argues its latest maneuvers in state court are an attempt to seek injunctive relief requiring the responsible parties to bring the Dam into compliance by completing needed repairs. The NJDEP argues such actions fall under the police and regulatory power exception. The NJDEP asserts the purpose of the NJDEP Application and 2024 Administrative Order is to promote public safety and welfare and to effectuate public policy by requiring the responsible parties to repair the Dam. The NJDEP maintains it lacks any pecuniary interest in the Dam as it is not responsible for repairing the Dam.

### C. Analysis

What is clear to this court is that the Dam Litigation has involved a long and tortured history notably marked by both the Debtor and his now-deceased father's failure to either repair the Dam or to fund the repairs. What is not clear to this court is whether given the complex history of the Dam Litigation that the NJDEP's current state court motion and administrative order should be analyzed under the public policy and pecuniary benefit analysis to determine whether the NJDEP's actions fall within the police and regulatory exception to the automatic stay.

First, this court does not doubt that the Dam Litigation is a valid exercise of the NJDEP's police and regulatory power. When the condition of a dam in the State of New Jersey poses a threat to the environment, the NJDEP can seek the repair of a dam through the SDA. As set forth by the NJDEP:

> 4. The [SDA] controls the construction, maintenance and repair of dams within the State of New Jersey. The act applies to any dam or reservoir that will raise the waters of a river or stream five feet or more above its usual main low water height. N.J. Stat. Ann. 58:4-1. The act empowers the DEP to regulate construction, repairs, alterations or improvements of dams and reservoirs and authorizes the DEP to issues orders requiring owners to owner to make alterations, additions or repairs. N.J. Stat. Ann. 58:4-5.
>
> 5. The [SDA] does not give the Department the authority to repair a dam and to seek reimbursement from a responsible party. Rather, the act only allows the Department to remove a dam and to seek reimbursement where it finds that the dam presents an "imminent danger of failure and has reasonable cause to believe that danger to life or property may be anticipated from the reservoir, dam or appurtenant structures located therein . . . ." and the Department removes the dam. N.J. Stat. Ann. 58:4-5(d)(1). To date, the DEP has determined that the Dam does not present an imminent danger of failure. (Cert. of Oman ¶ 2).

Doc. No. 52, ¶¶ 4-5. Indisputably and generally speaking, the SDA and actions in connection therewith fall under the NJDEP's police and regulatory powers and in turn, would fall under exception to the automatic stay under section 362(b)(4). "No more obvious exercise of the State's power to protect the health, safety, and welfare of the public can be imagined. Indeed, both the Senate and the House committee reports on the Bankruptcy Reform Act explicitly acknowledge environmental protection as a part of the State's police power." *Penn Terra*, 733 F.2d at 274. *See also United States v. Nicolet, Inc.*, 857 F.2d 202 (3d Cir. 1988) (finding that an environmental statue similar to the SDA was excepted from the automatic stay); *In re New York Trap Rock Corp.*, 153 B.R. 642, 645 (Bankr. S.D.N.Y. 1993) (finding that an environmental statute similar to the SDA was excepted from the automatic stay). Plainly, actions pursuant to the SDA fall within the exception to the automatic stay under section 362(b)(4).

Second, contrary to the assertions of the NJDEP, there is a money judgment. Although the Bankruptcy Code does not define the term "money judgment" both the Supreme Court of the United States and the Third Circuit have addressed the term "money judgment" in *Ohio v. Kovacs*, 469 U.S. 274 (1985) and *Penn Terra Ltd. v. Dep't of Envtl. Res.,* 733 F.2d 267 (3d Cir.1984) respectively.

10

In the context of the money judgment exception to police and regulatory exception to the automatic stay, the Third Circuit has directed courts to use the following criteria to determine whether a money judgment has been entered.:

> In common understanding, a money judgment is an order entered by the court or by the clerk, after a verdict has been rendered for plaintiff, which adjudges that the defendant shall pay a sum of money to the plaintiff. Essentially, it need consist of only two elements: (1) an identification of the parties for and against whom judgment is being entered, and (2) a *definite* and *certain* designation of the amount which plaintiff is owed by defendant. It need not, and generally does not, contain provisions for its enforcement. *See generally* 49 C.J.S. *Judgments,* §§ 71–82 (describing proper form of money judgment).

*Penn Terra*, 733 F.2d 267, 275 (3d Cir. 1984).

While not directly on-point, the *Kovacs* opinion is instructive. In *Kovacs*, the Supreme Court considered whether a debtor's obligation under an injunction directing a debtor clean up a hazardous waste site was a "debt" or "liability on a claim" subject to discharge under the Bankruptcy Code, 11 U.S.C. § 727(b). Prior to Kovacs and related corporate defendants filing for bankruptcy, Ohio sued them for violation of environmental laws and judgment was entered enjoining Kovacs from further polluting the air or public water ways, forbidding him from bringing additional industrial wastes onto the site, requiring Kovacs to remove specific wastes from the property, and ordering payment of $75,000.00 in compensation to Ohio for injury to wildlife. Kovacs and the corporate defendants failed to perform their obligations and Ohio obtained appointment of receiver who took possession of Kovacs' and the corporate defendants' assets. Thereafter, Kovacs filed for bankruptcy and Ohio filed an action seeking a declaration that Kovac's obligations under the judgment were not a "debt" or "liability on a claim" within the meaning of the Bankruptcy Code.

The Supreme held that Kovacs' obligations under the affirmative injunction to clean up the hazardous waste site constituted a debt or liability on a claim subject to discharge. The Supreme Court noted that "it makes little sense to assert that because the cleanup order was entered to remedy a statutory violation, it cannot likewise constitute a claim for bankruptcy purposes." 469 U.S. at 279. The Supreme Court further observed that where the receiver and Ohio each only sought money payment to effectuate the cleanup of the site and both the receiver and Ohio would have been satisfied if Kovacs had furnished the funds either before or after the bankruptcy***, the cleanup duty had been reduced to a monetary obligation***. *Id.* at 282 (emphasis added).

The Supreme Court rejected Ohio's reliance upon *Penn Terra* and distinguished that case opining:

> There, the Court of Appeals for the Third Circuit held that the automatic stay provision of 11 U. S. C. § 362 did not apply to the State's seeking an injunction against a bankrupt to require compliance with the environmental laws. This was held to be an effort to enforce the police power statutes of the State, not a suit to enforce a money judgment. But in that case, there had been no appointment of a

11

> receiver who had the duty to comply with the state law and who was seeking money from the bankrupt. The automatic stay provision does not apply to suits to enforce the regulatory statutes of the State, but the enforcement of such a judgment by seeking money from the bankrupt — what the Court of Appeals for the Sixth Circuit concluded was involved in this case — is another matter.

*Kovacs*, 469 U.S. at 283 n.11.

The NJDEP argues that as it pertains to the repair work necessary for the Dam, there is no money judgment against the Debtor. This court cannot agree. The 2010 Order establishes the Debtor's liability and as such, identifies the Debtor as a party for and against whom a judgment for the costs of repair is being sought. The 2012 Order established that the Debtor was directly liable for 45% of the costs necessary to fund the necessary studies and to repair the Dam. To aid in the enforcement of that 2012 Order, the Receiver was appointed to collect money from the Debtor for repair costs and made the Receiver solely responsible for the reconstruction and repair of the Dam and the Debtor was responsible for his share of the costs related thereto. Undeniably, after application to the state court the Debtor, *inter alia*, was identified as a party and a judgment was entered against him for a percentage of the costs associated with the repair of the Dam.

As to a definite and certain amount, in its amended cross-motion in Aid of Litigant's Rights seeking to enforce the court's previous orders, the NJDEP asked the court to require the Debtor to deposit $1,078,578.45 with the Receiver for the Dam's repair. The court granted that relief in its May 9 Order and any question as to whether the May 9 Order constituted a money judgment, the state court cleared the issue up in its November 14 Order when it specifically stated: "[o]n May 27, 2022, the NJDEP notified Defendant of the amount owed: $1,078,578.45. . . . ***Thus, the order dated May 9, 2022 was a final Order for a sum certain and NJDEP is a valid judgment creditor.***" Doc. No. 52-16, at 6 (emphasis added). Indeed, all efforts made by the NJDEP before the entry of the November 14 Order were focused on collecting funds from the Debtor to enforce its judgment.

Without question, the November 14 Order confirmed the NJDEP has a valid money judgment against the Debtor for a sum certain. Before then, all of its efforts against the Debtor were solely to collect funds and not for the Debtor to personally repair the Dam — that was the Receiver's job. During oral argument on the Motion here, the court understood the NJDEP to argue that the May 9 Order's declaration that it was a judgment creditor only for purposes of the $700,000.00 penalty imposed. But the court does not accept this position as it is inconsistent with the NJDEP's own admissions in its pleadings that it has a judgment for the costs of construction and the amount of that judgment is $1,078,578.45. *See* Doc. No. 52-25, at 3. What is more, the express repeated language utilized by the state court specifically refers to the deposits for the repair/construction costs, i*n addition to the "penalty"*, as well as specifically using the term "*judgments*" in the plural, not singular. The admission by the NJDEP and the specific language used by the state court is clear and unambiguous and supports a finding that the state court concluded that the NJDEP is a valid judgment creditor for a sum certain as it pertains to the deposits for the construction costs —determined to be $1,078,578.45 at that time. Consequently, the definition provided in the *Penn Terra* case set forth above, is satisfied.

Additionally, like Ohio in *Kovacs*, the NJDEP has consistently pursued the Debtor for a monetary contribution and has not sought personal performance from the Debtor in more than a

12

decade as evidenced by the appointment of the Receiver who was charged with the repair of the Dam. While the Receiver in this case did not take possession of the Dam like the *Kovacs'* receiver, this difference is immaterial. In both cases, a receiver was appointed because the responsible parties failed to perform repair and remediation duties and the receivers were appointed to perform these obligations through funding obtained from the Kovacs' property or, in this case, by obtaining monetary contributions from the Debtor and other responsible parties. It is clear the NJDEP would have been satisfied with a monetary contribution from Debtor had he fulfilled the obligation prior to filing for bankruptcy. Thus, the court further concludes that prior to the filing of the bankruptcy Debtor's repair obligation had been reduced to a monetary obligation.

The Court has gone to great lengths to establish that the Dam Litigation is a valid exercise of the NJDEP's police and regulatory powers and that as a result of exercising these powers the NJDEP has reduced the Debtor's obligation to a monetary judgment. The NJDEP now seeks to undo this monetary judgment and restart the Dam Litigation to seek either injunctive or declaratory relief requiring personal performance from the responsible parties including the Debtor. The NJDEP argues that its 2024 Administrative Order and the NJDEP Application are excepted from the automatic stay and cannot be characterized as enforcement of monetary judgment which would be prohibited by the exception to the exception.

The court agrees with the Debtor that if the NJDEP was attempting to enforce collection of its monetary judgment in state court, the NJDEP's actions would be in violation of the automatic stay. However, as the court reads the facts, the NJDEP is ***not*** seeking to enforce its monetary judgment. In fact, the NJDEP is attempting to abandon its monetary judgment. In the court's view, by issuing the 2024 Administrative Order and filing the NJDEP Application, The NJDEP is attempting to circumvent the money judgment exception to the police and regulatory power exception to the automatic stay in order to frustrate any perceived benefits or advantages the Debtor may acquire under the Bankruptcy Code. Whether the attempt to abandon the judgment is a violation of the automatic stay is the crux of the issue.

The court has done extensive research and it was unable to find any cases that mirror the fact pattern here. The court has reviewed numerous cases wherein the public policy and pecuniary benefit tests were applied, and that analysis usually came into play when the government was in the initial stages of seeking a remedy such as an injunction or declaratory relief requiring cleanup or remediation. The current procedural posture of the Debtor's case does not easily fit into the public policy and pecuniary benefit tests. The Dam Litigation is not its initial stages. The NJDEP, through the Dam Litigation, established the Debtor's liability to repair the Dam and his 45% share of the liability. When the Debtor and the other responsible parties failed to repair the Dam, the NJDEP sought and obtained the appointment of the Receiver who by state court order became the party responsible for the repair of the Dam. From the appointment of the Receiver in 2012 through 2023, the NJDEP sought no more than a monetary contribution from the Debtor to repair the Dam. As discussed above, whether viewed under the *Penn Terra* definition of money judgment or under *Kovacs*, the NJDEP's litigation strategy resulted in the Debtor being obligated to pay a money judgment in order for the Receiver to fulfill his responsibilities to repair the Dam.

Given the unique circumstance presented by this case, the court does not believe it should analyze this case under the traditional public policy and pecuniary interest tests and the monetary judgment exception to the police and regulatory powers exception. The Dam Litigation has

13

proceeded too far for the traditional analysis to be of use. Rather the court believes that it should weigh the rights and obligations of the Debtor under the Bankruptcy Code against the NJDEP's need to enforce the SDA to protect the public health and welfare.

"The primary purposes of the automatic stay provisions are to effectively stop all creditor collection efforts, stop all harassment of a debtor seeking relief, and *to maintain the status quo* between the debtor and [his] creditors, thereby affording the parties and the Court an opportunity to appropriately resolve competing economic interests in an orderly and effective way." *Taylor v. Slick*, 178 F.3d 698, 702 (3d Cir. 1999) (citations omitted) (emphasis in original); *I.C.C. v. Holmes Transp. , Inc.*, 931 F.2d 984, 987 (1st Cir. 1991) (The automatic stay "is designed to affect an immediate freeze of the at the outset of the chapter 11 proceedings). In addition, the automatic stay provision is intended "to allow the bankruptcy court to centralize all disputes concerning property of the debtor's estate so that reorganization can proceed efficiently, unimpeded by uncoordinated proceedings in other arenas." *SEC v. Brennan*, 230 F.3d 65, 70 (2d Cir. 2000) (quoting *In re United States Lines, Inc.*, 197 F.3d 631, 640 (2d Cir. 1999)) (internal quotation marks omitted); *In re Billings*, 687 F. App'x 163, 165 (3d Cir. 2017) (the automatic stay provisions are intended *to maintain the status quo* between the debtor and creditors in order to allow the parties and the Court an opportunity to appropriately resolve competing economic interests in an orderly and effective way) (emphasis in original).

Numerous courts have concluded that pursuant to the police and regulatory exception 362(b)(4) of agencies such as the NJDEP may pursue enforcement of statutory obligations against debtors until entry of a money judgment. *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, 488 F.3d 112, 133 (2d Cir. 2007); *In re Commonwealth Oil Ref. Co.*, 805 F.2d 1175, 1183 (5th Cir. 1986); *Penn Terra*, 733 F.2d at 275. However, the money judgment exception to the police and regulatory exception prohibits efforts to collect upon a money judgment. S*ee, e.g.*, *See, e.g.*, *SEC v. Brennan*, 230 F.3d at 71 (once a money judgment is affixed the agency is "no longer acting in its "police or regulatory" capacity, and the exception to the exception does not apply"); *Brock*, 829 F.2d at 389 (the automatic stay prevents a governmental unit from enforcing a money judgment).

Two decades ago, the NJDEP began its quest to enforce the provisions of the SDA pursuant to its police and regulatory powers. In 2010, the NJDEP obtained summary judgment and thereafter orders apportioning liability among the parties and orders reducing Debtor's obligation to a fixed sum. These court proceedings resulted in the Debtor's obligation to repair the Dam being reduced to a monetary obligation. *Kovacs¸*469 U.S. at 282-283. For more than a decade the NJDEP pursued the Debtor for payment in order to fund the repair of the Dam by the Receiver. Now, after the Debtor filed for bankruptcy, the NJDEP filed motions in state court that seek to reverse its decade long pursuit of a financial contribution from Debtor and seeks to compel the Debtor to reconstruct the Dam. The NJDEP justifies this U-turn as an allowable use of its police and regulatory powers as reconstruction of the Dam will prevent future harm. Implicit in the NJDEP's arguments is the assumption that the state court will rubber stamp the NJDEP's efforts to reverse the 2023 Administrative Order and to do away with the position of receiver despite the Debtor's vigorous opposition. While the procedural propriety of the NJDEP's Application and 2024 Administrative Order are not before this court, the court is dubious as to whether the NJDEP's actions will survive state court scrutiny given that NJDEP has proceeded as far as obtaining a money judgment against the Debtor. The court questions whether the issuance of the 2024 Administrative Order was consistent with New Jersey's Administrative Procedure Act and

14

whether the NJDEP's actions are barred by judicial estoppel, res judicata, and/or New Jersey's Entire Controversy Doctrine. This further bolsters the court's belief that it would benefit neither the Debtor, the other responsible parties, nor the general public to allow the NJDEP to continue its new course of litigation.

The court believes the NJDEP has reversed its decade long course because the NJDEP wishes to avoid the exception to the exception which bars the collection of money judgments while the automatic stay is in effect. *Matter of Commonwealth Oil Refining Co., Inc.,* 805 F.2d 1175 (5th Cir. 1986), *cert. denied,* 483 U.S. 1005 (1987) (holding that to qualify for the exception to stay for enforcement of a state's police or regulatory power the purpose of the governmental action must be the conservation of public health, safety, or welfare). The court looks askance at such maneuvers particularly where such actions introduce uncertainty and instability into the Debtor's bankruptcy case and the proposed Plan provides the funding needed to satisfy the monetary obligation to repair the Dam within a specified period of time. *Nortel Networks*, 669 F.3d at 140 (courts should "look to the purpose of the proceeding at issue").

While this court recognizes the importance of the NJDEP's efforts to ensure the reconstruction of the Dam, the Debtor's rights under the Bankruptcy Code are a competing interest. The automatic stay is designed to protect the status quo as of the filing of the bankruptcy case in order to allow the Debtor breathing space to reorganize his affairs unimpeded by other proceedings in state court. When the Debtor filed this bankruptcy case, he owed a money judgment as a result of the NJDEP's state court civil enforcement action. The court is obligated to weigh the competing interests of the NJDEP and the Debtor. If this court were to allow the NJDEP to move forward with its various motions in state court, the nature of the Debtor's obligation could be transformed from a money judgment to essentially a positive injunction or declaratory relief requiring the Debtor to reconstruct the Dam. Changing the form of the Debtor's obligation to the NJDEP is not consistent with maintaining the status quo. Indeed, on-going concurrent state court proceedings would interfere with the Debtor's ability to craft and implement a plan as the Debtor would be unable to accurately determine the extent and nature of his obligations to the NJDEP under the SDA.

The court acknowledges the importance of the requirements of the SDA and the NJDEP's frustration with Debtor's repeated refusal to meet his obligations. Nevertheless, the court does not believe that the best interests of the public and the Debtor are served by allowing the NJDEP to move forward in state court. The status quo can be maintained by substitution of the receiver – something the NJDEP has admittedly not even considered or pursued but instead chooses to reverse course in its entirety. At oral argument, the NJDEP suggested that even if it were to seek a substitute receiver, no one would step into the receivership position because they would not get paid. But the court is not impressed with this argument. Upon substitution of the receiver, the Debtor can move towards confirmation of the Plan which proposes to pay his debts to the NJDEP over the course of the plan. The NJDEP may leverage its objections to the Plan to negotiate with the Debtor to ensure that tight reins are put in place. In this way, the NJDEP through the substitute receiver, will receive funds for the reconstruction of the Dam (including the costs of the receiver) and should the Debtor fail to comply with the provisions of the Plan, the case will be dismissed as bankruptcy is not a haven for bad actors.

In the court's view, allowing the NJDEP pursuant to its police and regulatory powers to reverse its course of litigation to some point in time prior to the appointment of a receiver would not expedite the repair of the Dam given that the Debtor has not complied with prior state court orders and has not cooperated with the Receiver. The court hopes the benefits the Debtor receives in bankruptcy will compel him to satisfy his obligation to the NJDEP. The court warns the Debtor that this bankruptcy proceeding is his last and best chance to resolve the Dam Litigation once and for all and that it will not allow the Debtor to ignore his obligations as he has done in the past.

Debtor has requested that the court impose sanctions upon the NJDEP for its willful violation of the automatic stay. Section 362(k) of the Bankruptcy Code, 11 U.S.C. §362(k), authorizes, *inter alia,* recovery of actual damages for any willful violation of a stay. The Third Circuit has opined:

> "It is a willful violation of the automatic stay when a creditor violates the stay with knowledge that the bankruptcy petition has been filed. *In re University Medical Center,* 973 F.2d 1065 (3d Cir. 1992). Willfulness does not require that the creditor intend to violate the automatic stay provision, rather it requires that the acts which violate the stay be intentional. *Id.*

*In re Lansdale Family Rests., Inc.*, 977 F.2d 826, 829 (3d Cir. 1992). There is no question the NJDEP was aware that the Debtor had filed for bankruptcy as it was the initiation of the bankruptcy proceedings that motivated the NJDEP to issue the 2024 Administrative Order and file the NJDEP Application. In fact, in its state court pleadings, the NJDEP acknowledged the Debtor had filed bankruptcy. These acts are a willful violation of the automatic stay.

Accordingly, for all of the foregoing reasons, the court concludes that issuance of the 2024 Administrative Order and the filing of the NJDEP application were a violation of the automatic stay. Having concluded that the NJDEP violated the automatic stay, the court may award actual damages, attorneys' fees and costs, and, in appropriate circumstances, punitive damages. 11 U.S.C. § 362(k). For all that, it has not been demonstrated, and the court is not convinced, that the actions of the NJDEP in connection with this bankruptcy case rise to a level where punitive damages are warranted. Certainly, mere speculation of misconduct in the underlying state court action is not enough. The Debtor must prove intentional misconduct related to the stay violation in this case before the court would consider punitive damages. In short, the NJDEP's maneuver here alone is not enough to warrant punitive damages. Nevertheless, to determine whether the Debtor suffered any actual damages and whether a reasonable amount of attorneys' fees should be awarded, the court requires additional evidence. Unless the parties confer and agree to a discovery and/or briefing deadline on their own, the court shall schedule a status conference for May 7, 2024, at 2:00 p.m. for the purposes of setting a schedule and the calendaring of an evidentiary hearing.

### II.     Rule 2004 Subpoenas

Debtor has issued three nearly identical Rule 2004 subpoenas to the NJDEP, the Receiver, and the Pines Club. The NJDEP filed a cross-motion to quash the Rule 2004 subpoena along with

its Opposition to Motion to Determine Stay Violation. The NJDEP objects to the Rule 2004 the subpoena. Additionally, both the Receiver and the Pines Club filed objections.

Counsel for the Debtor suggested that the purpose of the subpoenas was to determine a pattern of bad faith towards the Debtor purportedly warranting a finding of punitive damages. The court doesn't see it but should the Debtor wish to pursue this course of action, his counsel shall file a certification and brief in support of his position by April 19, 2024. The other parties may respond by April 26, 2024. The court will hear the matter on May 7, 2024, at 2:00 p.m. If nothing is timely filed by the Debtor, the subpoenas will be noted as withdrawn.

## CONCLUSION

Accordingly, the court determines that based on the current procedural posture of the state court litigation, including the entry of a money judgment against the Debtor, the police and regulatory power exception to the automatic stay is not applicable and the NJDEP has violated the automatic stay.

A determination of damages shall be made by the court following additional proceedings.

An appropriate order consistent with this decision has been entered.

The court reserves the right to revise its findings of fact and conclusions of law.

/s/ Andrew B. Altenburg, Jr.
United States Bankruptcy Judge

Dated: April 2, 2024